IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| ROBERT EUGENE EDWARDS, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 13-4239-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Edwards, Jr., seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to find that plaintiff meets listing 12.05C. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

### I. BACKGROUND

On August 15, 2011, plaintiff applied for disability benefits alleging that he had been disabled since December 12, 2008. Plaintiff's disability stems from a learning impairment, left eye blindness, and attention deficit hyperactivity disorder. Plaintiff's application was denied on November 9, 2011. On August 21, 2012, a hearing was held before an Administrative Law Judge. On August 24, 2012, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On September 17, 2013, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

### II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is

whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.    *BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS*

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the

2

Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform.  Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled.  These regulations are codified at 20 C.F.R. §§ 404.1501, et seq.  The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

> 1. Is the claimant performing substantial gainful activity?
>
>    Yes = not disabled.
>    No = go to next step.
>
> 2. Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?
>
>    No = not disabled.
>    Yes = go to next step.
>
> 3. Does the impairment meet or equal a listed impairment in Appendix 1?
>
>    Yes = disabled.
>    No = go to next step.
>
> 4. Does the impairment prevent the claimant from doing past relevant work?
>
>    No = not disabled.
>    Yes =  go to next step where burden shifts to Commissioner.
>
> 5. Does the impairment prevent the claimant from doing any other work?
>
>    Yes = disabled.
>    No = not disabled.

## IV.    THE RECORD

The record consists of the testimony of plaintiff and vocational expert Danny Zumalt, in addition to documentary evidence admitted at the hearing.

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff earned the following income from 1999 through 2012:

| Year | Earnings | Year | Earnings |
| --- | --- | --- | --- |
| 1999 | $ 1,998.82 | 2006 | $ 7,204.00 |
| 2000 | 924.80 | 2007 | 2,071.07 |
| 2001 | 1,429.50 | 2008 | 2,774.10 |
| 2002 | 4,433.19 | 2009 | 0.00 |
| 2003 | 5,800.37 | 2010 | 0.00 |
| 2004 | 650.25 | 2011 | 2,701.12 |
| 2005 | 4,838.58 | 2012 | 2,426.00 |

(Tr. at 146, 154, 155).

### Function Report - Third Party

In a Third Party Function Report dated September 25, 2011, plaintiff's mother described his typical day as follows: "shower, eat, dressed, watch TV, work, school" (Tr. at 237). Plaintiff takes care of his son (Tr. at 238). There was nothing that he was able to do before his disability that he could no longer do (Tr. at 238). Plaintiff is capable of performing all activities of personal care (Tr. at 238). He can prepare meals, do laundry, iron, mow, clean, drive a car, use public transportation, shop in stores, count change, and play video games (Tr. at 239-241). His impairments affect only his ability to see and remember; his impairments do not affect his ability to follow instructions, complete tasks, concentrate, understand, or get along with others (Tr. at 242). He had been fired from "quite a few jobs" because he gets upset when someone tries to give him advice on how to do something (Tr. at 243).

**Disability Report - Appeal**

In a Disability Report - Appeal dated November 30, 2011, plaintiff reported that he had been working 20 hours per week at Holiday Inn since September 2011 earning $8.25 per hour (Tr. at 263).

B.  *SUMMARY OF MEDICAL AND EDUCATIONAL RECORDS*

Plaintiff's elementary school records show that he had a verbal IQ of 69, a performance IQ of 69, and a full scale IQ of 68 when he was in third grade (Tr. at 283). The record does not reflect when the testing was done.

In school records dated April 15, 1997, it is noted that as of April 25, 1994, he had a verbal IQ of 67, a performance IQ of 75, and a full scale IQ of 69 (Tr. at 315, 344). On May 12, 1997, plaintiff's verbal IQ was 69, performance IQ was 69, and full scale IQ was 68 (Tr. at 317). This test, the WISC-III (Wechsler Intelligence Scale for Children), was administered by Paula Steeno, Ed.D (Tr. at 317). On that same day, she administered the TONI-2 and determined that plaintiff scored a quotient of 91 "which places him . . . in the average range of intellectual functioning" (Tr. at 319). He also took the WIAT[1] on that same day which revealed that plaintiff had a "very simplistic" writing style and spelled phonetically (Tr. at 320).

Plaintiff's high school records, dated May 15, 1997, show that pursuant to the WISC-III, plaintiff had a verbal IQ of 69, a performance IQ of 69, and a full scale IQ of 68 (Tr. at 175). The records do not indicate who administered the intelligence testing or when the testing was done.

On May 15, 1997, his school records included the following: "BJ spends a lot of time trying to get others in trouble. He spends more time watching others and informing me of their behavior than he does taking notes, learning math, etc." (Tr. at 327). "Talking with

---

[1]Wechsler Individual Achievement Test -- helps assess academic strengths and weaknesses

others, plays around instead of working. BJ wants to talk to other students. Has a bad habit of interrupting. BJ does struggle with some of the concepts but he can do the projects and sometimes chooses not to work on them." (Tr. at 328). "BJ . . . is at times argumentative about tasks he is asked to work on in class." (Tr. at 338). He was given the Oral and Written Language Scales (OWLS) test on that day and was noted to wait an "unusually long time before making a response. Often the response was correct." (Tr. at 331). His listening comprehension was in the low average range; oral expression was in the below average range (Tr. at 331). Vocabulary was in the below average range (Tr. at 332).

Plaintiff's IEP (Individualized Education Program) indicated that he suffered from a language disorder (Tr. at 179). He was scheduled for language therapy 20 minutes per week (Tr. at 180). His strengths reflected that he was "organized and gets along well with peers" (Tr. at 181, 203). The following was written regarding his present level of educational performance:

> According to BJ's last WISC-III results, his cognitive ability was in the intellectually deficient range, but in the average range as measured by the TONI [Test of Nonverbal Intelligence]. . . . Teachers and parent report that the latter, nonverbal measure, is a better fit to BJ's abilities.

(Tr. at 181, 203).

> BJ is considered legally blind in the left eye. . . . BJ's poor eyesight has not caused him problems either on the job or in the classroom. . . .
>
> BJ has completed all math requirements for graduation. Organization and reading skills are a strength for BJ. He has been successful in researching careers and music information via the computer and books. . . .
>
> BJ's mother reports that his daily living and life skills are excellent. There is concern about the path BJ will take after graduation. . . .

(Tr. at 182, 204).

During his senior year, his "classroom teacher ha[d] not noted any significant concerns so far this year regarding his language abilities." (Tr. at 183, 205). The IEP states that plaintiff

Case 2:13-cv-04239-REL   Document 25   Filed 11/24/14   Page 6 of 20

had "a lack of awareness regarding his diagnosis as language disordered" (Tr. at 183, 205). His classroom accommodations consisted of "extended time on assignments" and "clarification on questions" (Tr. at 213).

Plaintiff's student suspension record from Columbia Public Schools shows that he was suspended multiple times for classroom disruption, fighting, insubordination, missing detention, tardiness, truancy, and selling drugs (Tr. at 278-280).

Plaintiff was able to pass the Missouri Constitution test and the United States Constitution test (Tr. at 281).

The record contains an unsigned, undated letter "To the family physician of B.J. Edwards" (Tr. at 298). It refers to the "9th grade teaching team" and states that plaintiff claimed to be ill at the beginning of reading class, he claimed to have "forgotten" when working math problems, he would lose assignments, he would have sudden bursts of energy, he would have problems sitting in a chair without rocking or twisting, and directions had to be repeated many times before he would follow them (Tr. at 298). The letter does not state why the letter was prepared, by whom the letter was prepared, or when the letter was prepared.

Plaintiff's college transcript shows that he took seven credit hours in the spring of 2011 earning a C in Acting, a B in African American Literature, and a B in College Orientation (Tr. at 304). In summer 2011, he earned a C in sociology and a B in public speaking -- a total of six credit hours during the summer session when classes move at twice the pace of a regular semester. On August 15, 2011, plaintiff filed his application for disability benefits. That fall 2011 semester, he took American History and Social Problems, earning a D in the former and an F in the latter. Prior to applying for disability benefits, plaintiff's college GPA was 2.538 -- this was three years after his alleged onset date. After he applied for benefits, his GPA dropped to 1.894 (Tr. at 304).

On October 11, 2011, plaintiff saw R. M. Newton, Ph.D., for a psychological consultation after having been referred by Disability Determinations (Tr. at 353-356). Plaintiff had missed his first appointment, explaining that he had had his children that day.

> Claimant presents as neat and well kempt. He is jovial and dressed appropriately for the season and occasion. . . . He is free of any abnormalities of ambulation, perception, or speech. . . .
>
> Claimant's affect is broad. His speech is clear and his thought processes are goal-directed. He has no intrusive thoughts, delusions, or hallucinations. He shows no thought blocking.
>
> When asked about why he is here, claimant says, "I have a problem, a disability with my eye and 'LD'." Claimant labels his mood as "pretty happy," but says it can change quickly. He says specifically, "I have an attitude with my mother," (with whom he lives.) . . .
>
> . . . Claimant does a substantial amount of household chores. He washes dishes, vacuums, takes out the trash, cleans his room, etc. He manages his self care without difficulty. . . . He drives as needed and drove himself to the interview. Claimant says he got his first driver's license in 2002, just after high school. He lost it for back child support. However, Claimant again took the driver's test in February 2011 and has a current, valid driver's license. . . .
>
> On an average day Claimant spends it looking for work. He specifies that his mother wants him to pay for his room and board and he says, "I'm 29," (as if to affirm the validity of her request.) Also on Mondays, Wednesdays, and Fridays he goes to Parkade Shopping Center and attends Moberly Area Community College to obtain his Associates Degree in general studies. Claimant has been attending since January 2011 and completed the semester. He feels his grades are "good." He got 2 Cs and a B. . . .
>
> . . . He specifies he has never been "fired." Claimant is currently looking for work and has a lot of applications in.

Cognitive functioning testing was performed and plaintiff exhibited "intact attention and concentration". He was able to make accurate change in small amounts. He exhibited an adequate fund of information.

Dr. Newton assessed adjustment disorder unspecified, chronic; learning disorder not otherwise specified, by history; economic and relational stressors, phase of life problems, and unemployment; with a GAF of 55 to 60.

8

Dr. Newton found that plaintiff has "minimal if any" restriction in activities of daily living; no difficulties in maintaining social functioning; no deficiencies of concentration, persistence or pace; and no repeated episodes of deterioration (Tr. at 357). He had an adequate ability to understand and remember instructions, to sustain concentration and persistence in tasks, and to interact socially and adapt to his environment.

On October 13, 2011, plaintiff saw Robert Wankum, M.D., an ophthalmologist (Tr. at 360). Plaintiff's best corrected visual acuity was 20/25 in his right eye and he was blind in his left eye.

On July 16, 2012, plaintiff underwent intelligence testing performed by Laura Brenner, Ph.D. (Tr. at 361-362). Plaintiff's full scale IQ was 66, placing him in the "extremely low range of intellectual ability." Dr. Brenner did not have access to any of plaintiff's records and concluded her report with the following:

> No specific diagnosis can be given based on test results alone. Information from clinical interview about Robert's history and current functioning would be needed to draw conclusions about test results.

### C. *SUMMARY OF TESTIMONY*

During the August 21, 2012, hearing, plaintiff testified; and Danny Zumalt, a vocational expert, testified at the request of the ALJ.

### 1. Plaintiff's testimony.

At the time of the hearing, plaintiff was 30 years of age, and he was 26 on his alleged onset date (Tr. at 30, 34). He was six feet tall and weighed 145 pounds (Tr. at 30). He was single but had two children, ages 11 and 5 (Tr. at 30-31). Plaintiff lives with his mother, and his younger child lives with him (Tr. at 31). He was brought to the hearing by his girlfriend (Tr. at 31).

At the time of the hearing, plaintiff was working at Holiday Inn and was insured through Medicaid (Tr. at 31-32). He completed high school but was in special education classes (Tr. at 32). Plaintiff had been taking classes at a community college the past year before his hearing (Tr. at 33). He stopped going to college because he was having trouble with work (Tr. at 33). He was having a lot of trouble in school (Tr. at 33). Plaintiff knows how to use a computer but did not have one to use at school (Tr. at 33-34).

Plaintiff alleges he became disabled on December 12, 2008, because that was day the day he stopped working at the Residence Inn (Tr. at 34). His duties there were cleaning bathrooms and wiping down desks, and he worked about 15 hours per week (Tr. at 34-35). Plaintiff lost his job there because the economy got bad and the hotel laid off some of its employees (Tr. at 35). Plaintiff now does laundry for Holiday Inn (Tr. at 35). He started that job a year before his administrative hearing (Tr. at 35). He had not had any hours over the last month because he was told his job performance was lacking (Tr. at 36, 49). "He would tell me to fold the towels tight, and I would fold them loose. And he would tell me not to overload the washing machine, and I would keep on overloading it." (Tr. at 49). Plaintiff applied for unemployment benefits a month before his administrative hearing, but he was denied benefits because he had not earned enough money (Tr. at 36-37). When he first started the job at Holiday Inn, he was working about 15 hours per week earning $8.25 per hour (Tr. at 36).

Plaintiff has been looking for another job since his hours were cut at Holiday Inn (Tr. at 37). He has looked for work at other hotels (Tr. at 37). Before doing hotel work, he had a job working at a fast food restaurant (Tr. at 38). He worked there part time for about a year in 2004 and 2005 (Tr. at 38). He was terminated from that job due to a misunderstanding with the management (Tr. at 38). Before that he worked at a couple of factory jobs for about nine months at one and three months at another through a temporary agency (Tr. at 39).

10

On a typical day plaintiff gets up at 7:00 a.m., showers and eats breakfast, watches television, and then takes a nap (Tr. at 40). He watches Good Morning America, the news, ESPN and Judge Judy (Tr. at 40, 42). When he wakes up from his nap, he goes outside to get some fresh air (Tr. at 40). He reads the newspaper, and he plays video games (Tr. at 41, 42). He occasionally talks to his sisters on the telephone (Tr. at 41-42). He eats out, he plays cards, and he plays games with his son (Tr. at 43). He bathes his child, fixes his meals, and turns on cartoons so his son can watch television (Tr. at 41). Plaintiff has no trouble with personal care, he prepares meals, he walks to McDonald's for food, he shops for groceries, he does laundry and dishes, he can make his bed and vacuum, he can mow the yard (Tr. at 44-45).

Plaintiff has a driver's license and had the same vision problems when he got his license (Tr. at 45). He was able to pass the written test, although it took him four times (Tr. at 45). No doctor has ever told him not to drive, and he last drove a month before the hearing (Tr. at 45). On that occasion he drove to the Division of Family Services (Tr. at 45). He is able to drive by himself (Tr. at 46). Plaintiff does not usually visit people, but he has friends who come visit him (Tr. at 46). Plaintiff has had a girlfriend for seven years who also comes to visit, and the two of them go out together (Tr. at 46). He goes to family events (Tr. at 46-47).

Plaintiff is taking no prescription medication (Tr. at 47). He does not smoke, drink alcohol, or use street drugs (Tr. at 47). He testified to problems with memory, but he was seeing no mental health professional (Tr. at 47). Plaintiff testified to problems concentrating and said he was having difficulty answering questions at the hearing, but the ALJ commented that plaintiff seemed to be "doing fine." (Tr. at 48). Plaintiff could not really describe a problem with concentrating despite claiming that he was experiencing such a difficulty (Tr. at 48).

2.  **Vocational expert testimony.**

Vocational expert Danny Zumalt testified at the request of the Administrative Law Judge. Plaintiff's past work includes laundry worker II, DOT 361.685-018, medium exertional level, unskilled with an SVP of 2; cleaner/housekeeper, DOT 323.687-014, light exertional level, unskilled with an SVP of 2; product assembler, DOT 706.687-010, light exertional level, unskilled with an SVP of 2; industrial cleaner, DOT 381.687-018, medium exertional level, unskilled with an SVP of 2; kitchen helper, DOT 318,687-010, medium exertional level, unskilled with an SVP of 2; and hand packager/inspector, DOT 920.587-018, medium exertional level, unskilled with an SVP of 2 (Tr. at 51-52).

The first hypothetical involved a person who could work at all exertional levels but would be limited to routine, repetitive, and simple work. He would be limited to occupations that do not require depth perception, and he must avoid hazards such as dangerous machinery and unprotected heights (Tr. at 52). Such a person could perform plaintiff's past work as a laundry worker II (Tr. at 52). The person could also work as a centrifugal casing machine changer, DOT 556.685-090, medium, unskilled with an SVP of 2, with 460 jobs in Missouri and 26,000 in the country (Tr. at 53). The person could work as a dovetail machine operator, DOT 669.685-046, medium, unskilled with an SVP of 2, with 120 jobs in Missouri and 10,500 in the country (Tr. at 53). The person could be a folding machine operator, DOT 208.685-014, light, unskilled with an SVP of 2 with 1,740 in Missouri and 46,310 in the country (Tr. at 53). Finally the person could work as a collator operator, DOT 208.6785-010, light, unskilled with an SVP of 2, with 1,160 in Missouri and 367,310 in the country (Tr. at 53). All of these jobs are considered "simple" (Tr. at 52-53). "The individual has to make no decisions upon his own. It is highly repetitive, and if accomplishing the job, based upon productivity of the machine, no supervisor interaction will take place." (Tr. at 54).

The second hypothetical was the same as the first except the person could not be in a job where he had to meet quotas or maintain a per-hour or per-day output (Tr. at 54). This limitation would not affect the person's ability to perform the above listed jobs (Tr. at 54). "There is no quota per se. There is a job to be done. In this instance, I have selected those that are non-productive type, not part of a team assembly or production. Simply, they are a feeder or off bearer. The machine set the pace. There isn't a number specific. It's based upon the machine productivity. If the individual can attend to the task at the machine and respond appropriately, he can accomplish this." (Tr. at 54).

The next hypothetical assumed an individual who could not maintain concentration, persistence or pace for 20 percent of the day (Tr. at 54). Such a person could not work competitively (Tr. at 55). A person with that kind of loss of concentration, persistence or pace would need to work in a sheltered workshop at best (Tr. at 55).

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Mary Leary entered her opinion on August 24, 2012 (Tr. at 9-20). She found that plaintiff's last insured date was December 31, 2011 (Tr. at 11).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 11). Plaintiff worked after this date but his earnings did not amount to substantial gainful activity (Tr. at 11).

Step two. Plaintiff suffers from the severe impairments of learning disorder, left eye blindness, and low vision (Tr. at 11).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 12). Childhood testing showed a verbal IQ of 69, a performance IQ of 69, and a full-scale IQ of 68. Intelligence testing as an adult showed that plaintiff had a full-scale IQ of 66, a verbal IQ of 70 and a performance IQ of 69. Although this appears to meet the first requirement of listing

12.05, the criteria of paragraph C and D are not satisfied. His visual impairment does not create an "additional significant work related limitation of function" (Tr. at 13). He is very high functioning despite his low IQ scores which calls into question the legitimacy of the IQ scores (Tr. at 13). Plaintiff has no more than mild limitations in activities of daily living; no more than mild difficulties in social functioning; and no more than moderate difficulties with concentration, persistence and pace (Tr. at 13-14). He has experienced no episodes of decompensation (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: He is limited to simple, routine and repetitive work; he is limited to occupations that do not require depth perception; and he must avoid hazards such as dangerous machinery or unprotected heights (Tr. at 14). With this residual functional capacity, plaintiff can perform his past relevant work as a laundry worker (Tr. at 18). Plaintiff performed this job both before and after his alleged onset date (Tr. at 18).

Step five. Although plaintiff is capable of performing his past relevant work, he is also capable of performing other work available in significant numbers in the economy (Tr. at 18). For example, he can work as a centrifugal casting machine operator, a dovetail machine operator, or a folding machine operator (Tr. at 19).

Therefore, based on steps four and five of the sequential analysis, the ALJ found that plaintiff is not disabled (Tr. at 19).

## VI. *LISTING 12.05C*

Plaintiff argues that the ALJ erred in finding that plaintiff's impairment does not meet or equal listing 12.05C.

The Eighth Circuit has interpreted Listing 12.05C -- mental retardation -- to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

The ALJ analyzed whether plaintiff met this listing:

In the present case, childhood intelligence testing revealed that the claimant had a verbal IQ of 69, a performance IQ of 69, and a full-scale IQ of 68. Follow up, adult intelligence testing showed a full-scale IQ of 66 on the WAIS-IV Adult Intelligence Scale. He also achieved a 70 on verbal comprehension, and a 69 on perceptional reasoning, which is certainly in the extremely low range of intellectual ability. While this certainly meets the first requirement of listing 12.05, the criteria of paragraph C and/or D are not satisfied. The claimant has left eye blindness and low vision. However, the evidence indicates that his resulting corrected visual acuity is 20/25, which is nearly perfect. Furthermore, he does not have significant visual field loss in his better eye. Thus, the claimant's vision does not appear to create an additional significant work related limitation of function.

The undersigned has also considered whether the "paragraph D" criteria are satisfied. . . . The claimant appears to be very high functioning despite his low IQ scores. This generally calls into question the legitimacy of the IQ scores. For instance, while the claimant alleged limited daily activities due to his learning disorder, he testified that he does not require assistance caring for his personal hygienic needs or getting dressed. He spends a typical morning watching "Good Morning America" or "Judge Judy" [and the news] to keep up on world events. He watches and cares for the needs of his young son daily. He makes his own breakfast and simple meals throughout the day. He is able to do household chores such as laundry, washing dishes, and mowing the grass. He walks to McDonalds when he does not cook. He spends time playing games with his son. He admitted that he is capable of driving and does actually drive on occasion. He spends time with his girlfriend. He shops at Wal-Mart twice a week for groceries and household items. For hobbies, he plays card games and video games. He watches ESPN . . . throughout the day to keep up to date on various sports. He reads newspapers daily. He talks on the phone to his sisters and goes outside daily to get some "fresh air." He also worked up to fifteen hours per week doing laundry at the local Holiday Inn until one month prior to the hearing. Since then, he has been cold calling other hotels to find another laundry job. He was very responsive to this judge at the hearing and appeared thoughtful and insightful in his responses to questions at [the] hearing. He was not tangential or easily distracted. Considering the claimant's full range of daily activities, along with his apparent high functioning in his work and personal life, the

15

undersigned finds that the claimant has no more than mild limitations in activities of daily living.

In social functioning, the claimant has mild difficulties. While the claimant alleged difficulty getting along and relating to other people, he testified that he lives with his family. He cares for the needs of his young son daily. He maintains a relationship with friends and his long-term girlfriend. He is able to go to public places as needed, such as Wal-Mart and McDonalds. He talks on the phone to his sisters on occasion. The claimant worked as a laundry attendant after his alleged date of onset, and did not report difficulty getting along with his co-workers. He went to community college classes and told an examining physician that he was doing well. There is no evidence to suggest that the claimant has acted inappropriately in his physician examinations; and to the contrary, he has been cooperative and friendly in examinations. Based on this evidence, it appears that the claimant's social functioning is not greatly hampered by his impairments, and instead he is able to maintain many social relationships and act appropriately in social situations. With this in mind, the undersigned finds that the claimant has no more than mild restriction in social functioning.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. There is clear evidence that the claimant has a low IQ and some deficits in learning. On the other hand, the claimant testified that he watches television shows and news programs daily, which requires some ability to concentrate, understand, and process what one is watching. He reads the newspaper daily, which also requires some residual reading comprehension skills. He plays video games and card games during the day, which requires the ability to follow instructions in order to navigate successfully the levels of any game in order to achieve a successful outcome and win. He drives as needed, which requires the ability to multi-task, by attending to surroundings and simultaneously paying attention to other drivers and the road to drive safely. He cares for the needs of his young son, which requires the ability to make judgments and adapt to the demands of a child. He has attended community college classes since his alleged date of onset, which requires the ability to pay attention for periods, absorb information, and process it through various assignments. He has worked as a laundry attendant since his date of onset, which requires the ability to concentrate sufficiently and stay on task to perform the assigned duties. He shops at Wal-Mart twice a week, which requires memory and organization in order to purchase needed items. Based on this evidence, it appears that the claimant's cognitive functioning is much higher than the low IQ scores, considered in isolation, would lead one to believe. Thus, considering these abilities, the undersigned finds that the claimant has no more than moderate limitations in concentration, persistence, and pace even with his alleged impairment.

(Tr. at 13-14).

Plaintiff argues that the first prong of the listing has been met because the ALJ pointed out that, "[C]hildhood intelligence testing revealed that the claimant had a verbal IQ of 69, a performance IQ of 69, and a full-scale IQ of 68. Follow up, adult intelligence testing showed a

full-scale IQ of 66 on the WAIS-IV Adult Intelligence Scale. He also achieved a 70 on verbal comprehension, and a 69 on perceptional reasoning, which is certainly in the extremely low range of intellectual ability. . . . [T]his certainly meets the first requirement of listing 12.05".

However, because the ALJ, later in her analysis, found that the "legitimacy of the IQ scores" was called into question, the above-quoted paragraph can be read to mean that the IQ score *on its face* "certainly meets the first requirement of listing 12.05."

An ALJ is not required to accept a claimant's IQ scores and may reject scores that are inconsistent with the record. Miles v. Barnhart, 374 F.3d 694, 699 (8th Cir. 2004).

> The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." . . . We have emphasized in the past that IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

Clay v. Barnhart, 417 F.3d 922, 928-929 (8th Cir. 2005). See also Christner v Astrue, 498 F.3d 790, 793-794 (8th Cir. 2007) ("[a]n ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior." quoting Muncy v. Apfel, 247 F.3d 728,733 (8th Cir. 2001)); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

In Johnson v. Astrue, 627 F.3d 316, 319-320 (8th Cir. 2010), the claimant had a performance IQ of 69, but he graduated in the top half of his class with As and Bs, and his daily activities and answers and abilities during his psychological tests were inconsistent with his IQ score.

In Cheatum v. Astrue, 388 Fed. Appx. 574 (8th Cir. (Mo) July 30, 2010), the claimant was able to work in semi-skilled and unskilled jobs for many years, perform activities of daily

Case 2:13-cv-04239-REL   Document 25   Filed 11/24/14   Page 17 of 20

living, and drive.  These factors are relevant as to whether the claimant had shown "deficits in adaptive functioning before age 22."  Likewise, in Hines v. Apfel, 317 Fed. Appx. 579 (8th Cir. (Mo) March 25, 2009), the court noted that the claimant had performed semi-skilled work and had not sought treatment for cognitive deficits, nothing in the claimant's medical records indicated a suspicion of mental retardation, and the claimant's demeanor at the hearing were all inconsistent with the claimant's low IQ scores.  In Clay v. Barnhart, 417 F.3d 922 (8th Cir. 2005), the court noted that the claimant had poor performance and an early exit from school, but there was no treatment record, diagnosis, or even inquiry into a mental impairment prior to the claimant applying for benefits which "weighs against a finding of an impairment."

Conversely, in Christner v Astrue, 498 F.3d 790, 793 (8th Cir. 2007), the claimant dropped out of school in a low grade and after having been in special education classes.  The court found that the claimant "likely met his burden of establishing onset before age twenty-two" because he had been unable to read or write, he had been unable to live independently, he was unable to keep jobs because he was slow, and he had a limited work history as a result.  In Maresh v. Barnhart, 438 F.3d 897 (8th Cir. 2006), the court found that the claimant had established deficits in adaptive functioning before age 22 because the record showed he struggled in special education, dropped out in the 9th grade, had trouble with reading, writing and math, got into frequent fights with other children, and his employment history consisted of only a couple weeks of employment after which he was terminated.

In this case, the record establishes that plaintiff was able to take college classes in which he earned 3 Bs and 2 Cs before he applied for disability benefits and thereafter his grades

18

Case 2:13-cv-04239-REL   Document 25   Filed 11/24/14   Page 18 of 20

dropped significantly.[2] The fact that he was able to work part time[3] while at the same time attend college and get good grades, take care of himself and his son, watch news shows and ESPN, read the newspaper, play card games and video games, function independently, do myriad household chores, mow the lawn, drive, shop alone, and handle money all establish that plaintiff's intellectual functioning was clearly higher than his IQ scores would indicate. The ALJ properly discounted the facial validity of the IQ scores in light of these other factors.

Plaintiff relies heavily on the comments written on his school records in support of his argument that he meets the listing. This argument is without merit. Plaintiff's school records also bear the following: "According to BJ's last WISC-III results, his cognitive ability was in the intellectually deficient range, but [it was] in the average range as measured by the TONI [Test of Nonverbal Intelligence]. . . . Teachers and parent report that the latter, nonverbal measure, is a better fit to BJ's abilities." Plaintiff's school records also reflect that he often played around instead of working, and he was able do the projects but "sometimes chooses not to work on them." "BJ's mother reports that his daily living and life skills are excellent." Plaintiff was able to pass the Missouri Constitution test and the United States Constitution test. He graduated from high school. He was able to pass his driving test twice, requiring a second test after losing his license for failing to pay child support.

Finally, plaintiff argues that his left eye blindness was a "'severe impairment' that significantly limit[s] the claimant's ability and aptitude to perform work," which is one of

---

[2] I also note that plaintiff testified he started doing poorly at school because he was having difficulties at work, not because he was having difficulties with school.

[3] Plaintiff argues that he lost his part-time job due to poor performance. However, I note that although plaintiff testified his hours were reduced because he could not remember how to perform his job correctly, he was able to describe during the hearing how his job was supposed to be performed. In addition, he had that job for a year before he was taken off the work schedule. Therefore, the record supports a finding that plaintiff was capable of remembering how to perform his job duties.

19

Case 2:13-cv-04239-REL   Document 25   Filed 11/24/14   Page 19 of 20

three prongs necessary to meet listing 12.05C. To the extent the ALJ made this finding, it is unsupported by the evidence. It is undisputed that plaintiff's eyesight did not change throughout his lifetime. His high school records include the following:

> BJ is considered legally blind in the left eye. . . . BJ's poor eyesight has not caused him problems either on the job or in the classroom. . . .

Plaintiff was in a part-time vocational program in high school -- he worked for several hours a day at a job and attended classes the other part of the day. His eyesight did not affect his ability to perform in the classroom; it did not affect his ability to perform a job in high school; and it did not affect his ability to work in factories, in a restaurant, or in hotels. Plaintiff has a valid driver's license which is entirely inconsistent with a visual impairment that "significantly limits his ability to perform work." In any event, this prong of 12.05C is not material since, as discussed at length above, the first prong of that listing has not been met.

### VII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 21, 2014